[Cite as *In re J.C.*, 2021-Ohio-3716.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of [J.C.] a minor,                   :

[J.M.,                                                        :              No. 20AP-358
                                                                             (C.P.C. No. 13JU-6011)
                    Appellant.]                          :
                                                                        (REGULAR CALENDAR)
                                                                :

---

### P L U R A L I T Y   D E C I S I O N

Rendered on October 19, 2021

---

**On brief:** *Yeura R. Venters*, Public Defender, and *Timothy Pierce*, for appellant J.M. **Argued:** *Timothy Pierce.*

**On brief:** *Robert McClaren*, for appellee Franklin County Children Services. **Argued:** *Robert McClaren.*

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

BEATTY BLUNT, J.

{¶ 1} Appellant-mother, J.M., appeals the March 13, 2020 order of the Franklin County Common Pleas Court Division of Domestic Relations, Juvenile Branch granting permanent custody of her daughter J.C. to appellee Franklin County Children Services ("FCCS"). (Jgmt. Entry Granting Permanent Custody at 16.) J.M. argues that the trial court lacked jurisdiction to grant permanent custody to FCCS, the trial court's decision to grant the motion was against the manifest weight of the evidence, the juvenile court had erred two and one-half years earlier by terminating provisional dispositional orders without considering whether to return custody of J.C. to J.M., and the court erred by failing to dismiss FCCS's permanent custody motion at a pretrial hearing, when both the guardian ad litem and FCCS indicated that they believed that granting the motion was not necessarily in J.C.'s best interest.

No. 20AP-358

## I. Factual and Procedural Background

{¶ 2} FCCS has been involved in this case for at least seven years. J.C. (d/o/b 1/19/2006) has been in the legal custody of at least four different entities during the period of involvement—first her mother, then FCCS, then her foster parents, then her maternal aunt, then FCCS again. J.C.'s mother J.M. is a serious problem drinker—she currently resides out of state, has intermittently been homeless, has frequently been unable or unwilling to comply with court restrictions and orders, and failed to appear at the permanent custody trial. J.C.'s father is in prison and similarly did not appear. J.C.'s maternal aunt, who obtained custody of J.C. at one point during the past seven years, has a serious mental illness that is often uncontrolled.

{¶ 3} The initial neglect and dependency complaint alleged:

> On or about, December 8, 2012, CPD was dispatched to * * * Oak St. in Columbus, Ohio on a report of a disturbance involving an intoxicated female. Upon arrival, officers were advised that mother [J.M.] had gone to the individual's home to attend a party and brought her two children with her[.] [J.M.] allegedly became aggressive by verbally yelling at everyone in the home including her children. [J.M.] became verbally belligerent towards the officers and began walking into the street yelling, screaming, and stumbling. [J.M.] was placed under arrest and charged with Disorderly Conduct. [J.C.] and [her older stepbrother O.S.] were transported to Franklin County Children Services for safekeeping under LAW status. The children were placed with a Maternal Aunt, [Y.M.] on an out-of-home safety plan. On January 31, 2013, Maternal Aunt presented at the Agency's intake office with the children and appeared altered in her thinking and was displaying signs of paranoia. Maternal Aunt reported that she had not slept or eaten in four days. Maternal Aunt further reported that she was fearful that someone was going to kill her and reported that her phones were tapped and people were listening. She admitted to a prior mental health history and not seeking treatment. * * * The Agency was granted LAW status of the children for safekeeping. Maternal Aunt remains at Netcare and there are no other alternative caregivers available or able to care for the children at this time. The Agency learned that the children have witnessed [J.M.] physically fighting with her boyfriend, sister, and neighbor in the past. [J.M.] is currently homeless and is not completing drug screens. Since that time, [J.M.] continues to be unable to provide proof of sobriety and has no income sufficient enough to meet the needs of her children. Maternal

> Aunt has not cooperated with service or [by] providing reports from her mental health providers.

(Compl. at 1-2.) J.M. admitted to a dependency count and the neglect count was dismissed, and FCCS was granted temporary custody of J.C. on June 19, 2013. (June 19, 2013 Mag.'s Decision at 1-3.)

{¶ 4} J.C. has not been in the custody of her mother J.M. for the past seven years, although there have been overnight visits and some periods where J.C. was in J.M.'s care and control pursuant to court orders. FCCS has filed for permanent custody of J.C. on two separate occasions—FCCS' first motion for permanent custody was denied on December 8, 2015, and legal custody of J.C. was granted to her foster parents at that time. But she did not remain with them—the foster parents subsequently relinquished custody and J.C. was taken into the care of her maternal aunt in August 2016. J.C.'s older stepbrother, who had also been in the legal custody of the foster parents, was placed in the custody of his grandmother in Georgia.

{¶ 5} On June 2, 2017, FCCS filed a motion for an alternative disposition of temporary custody over J.C., which was granted on September 13, 2017. FCCS' second motion for permanent custody, the one being reviewed in this appeal, was filed on February 12, 2018. The filing was mandatory based on R.C. 2151.413, and at a pretrial hearing on September 14, 2018, FCCS' counsel indicated that the agency was "simply ask[ing] for a trial date and, I guess, we'll just continue to see what case-plan progress [J.M.] makes between now and then." (Sept. 14, 2018 Tr. at 6.) The trial court observed that "this is the second motion for permanent custody. The first was denied, but this motion's been pending since February and by law it's supposed to be heard within four months." *Id.* Although there were some representations that J.M. had made some substantial progress on both her case plan and had made some general life improvements, she had missed several mandatory urine screens in the month prior to the hearing, had not completed several of her case plan objectives, and there was no indication from any of the parties or attorneys present that a hearing on FCCS' permanent custody motion could not or should not proceed. At a follow-up pretrial hearing six weeks later, the court examined J.M.'s case plan and treatment recommendations, and FCCS expressed the opinion that its motion needed to proceed; FCCS' counsel took the position that J.C. "needs permanency * * * we're still five years into it and [J.M.] is still only doing 50 percent of her screens and hasn't

No. 20AP-358

started drug and alcohol treatment." (Oct. 25, 2018 Tr. at 30-31.) [J.M.'s] counsel stated that although her client is "night and day from when I met her," she admitted her understanding that "I know the trial need[s] to [be] set, I get it, we need to move forward. This child needs permanency." *Id.* at 33.

{¶ 6} The court set another pretrial hearing for January 10, 2019 with an expected trial to follow. At that hearing, all parties agreed that [J.M.] had made progress in her drug and alcohol treatment, and although she had missed some screens, all that she submitted were negative. Accordingly, at that time there were some discussions about trying to resolve the case short of a permanent custody trial and termination of J.M.'s parental rights; it was clear that all parties present, in the words of FCCS' counsel, were "really eager not to PCC this child," but that "at some point, we've either got to fish or cut bait and say it's good enough and the child is going to go home or we're done" giving [J.M.] additional chances and terminate her parental rights. (Jan. 10, 2019 Tr. at 11.) In an apparent attempt to resolve FCCS' continuing concerns, J.M.'s attorney suggested to the court that J.M. could wear a secure continuous remote alcohol monitoring ("SCRAM") bracelet. The case was then continued until April 1, 2019 to allow J.C. to testify in camera.

{¶ 7} On March 28, 2019, J.C.'s guardian ad litem ("GAL") filed a separate motion for permanent custody to FCCS, noting that J.M. had failed to complete her case plan objectives in that she "does not regularly or consistently complete drug screens in order to demonstrate sobriety * * * has previously completed treatment yet continued to abuse alcohol. Since March 23, 2017, [J.M.] has missed 228 [drug/alcohol] screens. Of the 78 she has completed, 13 were positive for alcohol metabolites (ETG and/or ETS), one was positive for opiates, and two were positive for creatinine out of range (an indicator of possible dilution)." (Mar. 28, 2019 Mot. at 5-6.)

{¶ 8} On April 1, 2019 and prior to the commencement of the scheduled in camera interview, FCCS stated without any prior written warning that it "would ask the Court to withdrawal the [February 12, 2018] motion for permanent custody" and terminate temporary custody to FCCS under Court-Ordered Protective Supervision ("COPS") "based on [J.M.'s] case plan compliance and what my Agency believes to be in the best interest of the child." (Apr. 1, 2019 Tr. at 4.) The GAL was opposed to the termination of temporary custody, arguing that it "cannot recommend that it would be in [J.C.'s] best interest to go

home without [J.M.'s] proven sobriety," *id.* at 6, and observed that he had "filed a permanent custody motion and unfortunately did not get that filed in time to perfect service by today," and requested a continuance for service and trial. *Id.* at 4. The trial court, in response, entered an order finding that J.M. had been served with the GAL's PCC motion. The case was continued, but the court also ordered that J.M. was to be allowed overnight visits pending the next hearing and ordered a SCRAM bracelet for J.M. at FCCS' expense. (Apr. 1, 2019 Entry/Interim Order.)

{¶ 9} All parties continued to participate in the litigation, just as if FCCS had not suggested that it was withdrawing its motion. The case was continued several times, as it appeared J.M. was making progress. She wore the SCRAM bracelet without incident for several months and tested clean for alcohol. The GAL's motion remained pending during this period, but it seems that the court and the parties were in agreement that any action on permanent custody motions would not be taken. The trial court never affirmed on the record that FCCS' permanent custody motion had been withdrawn, and the court continued to exercise jurisdiction over the case rather than entering an order terminating temporary custody.

{¶ 10} The court conducted a second in camera interview of J.C. on September 10, 2019, and at that point she indicated that she had moved around a lot, she wanted to stay in her current school district (Whitehall), she liked staying with her current foster mother L.M., and while she was not ready to live with her [J.M.] yet, she did want to have "[l]onger time with my mom [J.M.]." (Sept. 10, 2019 Tr. at 44.) Following the second in camera interview, the trial court entered an order granting J.C. "leave status" to have an extended stay with J.M. "as of the end of the school day on 9.13.19. [J.M.] is to provide transportation to and from school. Visitation with foster mother [L.M.] is to occur every other weekend. [J.M.] is to immediately enroll in counseling through UMCH, Main Street location, and commence at first scheduling opportunity." (Sept. 12, 2019 Jgmt. Entry/Interim Orders.)

{¶ 11} Despite this apparent progress, on November 5, 2019 the GAL filed a report recommending custody be granted to foster mother L.M., reporting that J.C. had missed some 12 days of school while she was on "leave status" with [J.M.] and that there was concern that J.C.'s medical needs were not being properly addressed. Counsel for FCCS stated at the November 5, 2019 hearing that "my client does not want to prosecute the

Motion for Permanent Court Commitment that we filed," because things were going well in the home, but observed that "this is directly contradicted by what the child told the lay Guardian ad Litem and the attendance reports we've seen today." (Nov. 5, 2019 Tr. at 2.) FCCS again took the position that its motion should be withdrawn, that temporary custody should be terminated, and that J.C. should stay with J.M. under COPS. *Id.* at 45. But the court, for its part, again refused to consider any disposition at that time:

> JUDGE RAPP: Well, without any real evidence before the Court, I'm just getting reports, we have very conflicting reports but the -- the Agency's -- the caseworker is hearing -- not hearing the same thing as the -- as the CASA Volunteer and [J.M.'s] position is basically pretty much the same as what the Agency is saying, that -- there's nothing that serious in regard to her health care. I'm a little uncomfortable in making this decision without actually hearing any evidence.
>
> * * *
>
> So, as I see it, [at the next hearing on December 11, 2019] we're gonna (sic) -- the Court's going to decide whether to grant [J.M.] legal custody with protective supervision, or return the child to foster care, any questions?
>
> * * *
>
> Well, between now and then, I guess the best thing for [J.M.] to do is make sure that she is getting [J.C.] to all of her appointments, making sure she has her oxygen, gets to school on time, gets her grades up; anything else?

*Id.* at 45-48. The parties present, including [J.M.], signed a continuance entry "to hear evidence on the 2 oral motions before the court." (Dec. 11, 2019 Entry.)

{¶ 12} On December 4, 2019, the GAL filed a new "Motion for Alternative Disposition Granting Legal Custody to [foster mother L.M.]," observing that "[s]ince being placed with [J.M.], [J.C.] has missed a significant amount of school and has not attended school since November 12, 2019. The GAL is also concerned about [J.C.'s] medical condition and her compliance with ongoing treatment." (Mot. for Alternative Disposition at 2.)

{¶ 13} On December 11, 2019, [J.M.] and J.C. failed to appear for a scheduled hearing on all pending motions. It seems that J.M. had absconded to Pittsburgh with J.C., ostensibly for a new job. The trial court immediately terminated J.C.'s "leave status" and

No. 20AP-358

ordered J.M. to return J.C. to FCCS custody immediately. That same date, counsel for all parties signed an entry continuing the case "to set pending motions for trial - PCC x2 and motion for LC [legal custody] to former fo[ster] Mo[ther]." (Dec. 11, 2019 Jgmt. Entry/Interim Orders.)

{¶ 14} The case finally proceeded to trial on February 26, 2020 at 10:00 a.m. In the interim period, J.C. was located in Pittsburgh and returned to Columbus, and she was again placed in the home of foster mother L.M. J.M. did not appear for the trial—according to her attorney, "she has relocated to Pittsburgh. She has two jobs in Pittsburgh currently; she works at Giant Eagle in the hot deli section and she's in training at Rite Aid to be a pharmacy tech, and because of both she could not get transportation to be here today." (Feb. 26, 2020 Tr. at 4.) Prior to the commencement of trial, the GAL withdrew the motion for alternative disposition at the request of foster mother L.M., who had indicated she was no longer able to accept legal custody of J.C. but that she would be willing to adopt J.C. "if the Agency will allow it." *Id.* at 9. J.C. had also informed the GAL that she wished to be adopted by foster mother L.M.

{¶ 15} And despite its position at the two prior hearings, FCCS determined it was best to go forward and seek permanent custody:

> ATTORNEY SALING: Next month will make three years that this child has been in foster care most recently [but] her length of custodial history is actually about five years.
>
> * * *
>
> This case is very difficult given the child's age, given that the child has regular contact with [J.M.] as I understand by phone every day.
>
> But [J.M.], who everyone had been hoping would be able to reunify, seems like the end -- towards the end of the last year things just went badly. * * * The Agency caseworker has lost contact with [J.M.] * * *. To date we don't have an address for [J.M.]. We have not been given any information from her about being employed anywhere, we haven't been given any way to follow up to, you know, corroborate or get to the bottom of any of her claims of stability.
>
> [And] the SCRAM monitor, which had been provided to facilitate getting to the bottom of case, was removed according to the report the Agency received in November.

No. 20AP-358

> So we've -- we're reluctantly saying to the Court that we think
> it would be best to go forward today.

*Id.* at 12-14. With that, the GAL clarified that "with Children Services going forward on their motion for permanent custody I would also withdrawal the Guardian's motion for permanent custody *as it's duplicative.*" (Emphasis added.) *Id.* at 26. The case proceeded to trial on FCCS' motion for PCC—there were only two witnesses, the FCCS caseworker and the lay GAL, and all parties waived closing argument. *Id.* at 123.

{¶ 16} On March 13, 2020, the trial court issued a 16-page written judgment granting the motion for PCC, containing thorough written findings of fact and conclusions of law. (Jgmt Entry Granting Permanent Custody.) The trial court held that clear and convincing evidence established that: (1) J.C. could not be placed with a parent within a reasonable time and should not be placed with a parent; (2) J.C. had been in the agency's custody for 2 years or longer and no longer qualifies for temporary custody; (3) J.C. does not meet the requirements for a planned permanent living arrangement; and (4) no relative or other person has come forward to seek legal custody. *Id.* at 11. As a result, the court concluded that "[t]here is no practical alternative to a permanent placement of [J.C.] with [FCCS] for the purpose of adoption." *Id.* at 14. Following an analysis of J.C.'s best interest using the R.C. 2151.414(D)(2) factors, the court concluded that "all four of the circumstances set forth [in the statute] were proven by clear and convincing evidence," *id.* at 15, and also that "returning [J.C.] to [J.M.] would create a significant risk to her physical and mental health":

> [J.C.] is not opposed to the permanent custody motion and *wants to be adopted.* Although she has phone contact with [J.M.] daily, [J.C.] has consistently expressed her wish to remain with her foster mother.
>
> * * *
>
> [J.C.] was removed from [J.M.'s] custody when the Child was a 7-year-old. She is now a 14-year-old.
>
> [J.C.] has waited seven years for permanency. She has sickle cell disease, asthma, and sleep issues. She needs oxygen equipment and daily medication. When on "LEAVE Status," [J.C.] missed school and at least one medical appointment. [J.M.] cannot provide the care and stability needed by the Child.

No. 20AP-358

(Emphasis sic.) *Id.* at 14. The trial court granted FCCS' motion and committed J.C. to the permanent custody of FCCS. This timely appeal followed.

## II. Appellate review of permanent custody judgments.

{¶ 17} A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence. Accordingly, an appellate court will not overturn a permanent custody order when it is supported by competent, credible evidence. Further, in reviewing a judgment granting permanent custody to FCCS under the manifest weight standard, an appellate court must make every reasonable presumption in favor of the judgment and the trial court's findings of facts. If the evidence is susceptible of more than one construction, the court of appeals must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the juvenile court's verdict and judgment. (Citations and quotations omitted.) *See generally In re J.W.*, 10th Dist. No. 19AP-122, 2019-Ohio-4775, ¶ 21.

{¶ 18} Moreover, parents have a constitutionally protected fundamental interest in the care, custody, and management of their children. But parental rights are not absolute, and a parent's natural rights are always subject to the ultimate welfare of the child. Accordingly, the state may terminate the parental rights of natural parents, but such termination must be in the best interest of the child. *See generally id.* at ¶ 22. R.C. 2151.413 authorizes a public children services agency to file a motion requesting permanent custody of a child for which it has temporary custody, and when the child has been in the temporary custody of a public agency for 12 or more months out of a consecutive 22-month period, the agency is required to file a permanent custody motion. R.C. 2151.413(D)(1), cited in *J.W.* at ¶ 23. R.C. 2151.414(B)(1) permits a court to grant permanent custody of a child to a public agency if, after a hearing, it determines by clear and convincing evidence, that "(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child." *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 14. "Clear and convincing evidence" is " 'more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt.' " *J.W.* at ¶ 24, quoting *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 14. Rather, it means evidence that produces a firm belief

No. 20AP-358

or conviction as to the facts sought to be established. *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, ¶ 42, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 19} Thus, "[a] decision to award permanent custody requires the trial court to take a two-step approach." *K.L.* at ¶ 18. "First, a trial court must determine if any of the factors set forth in R.C. 2151.414(B)(1) apply," and second, the court determines whether granting permanent custody to FCCS is in the best interest of the child. *Id.* at ¶ 18-20. Relevant to this appeal, R.C. 2151.414(B)(1) provides the following circumstances under which FCCS is authorized to file a motion for permanent custody:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> * * *
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

Once it is established that one of the R.C. 2151.414(B)(1) circumstances is met, a trial court ruling on a motion for permanent custody must determine whether permanent custody is in the best interest of the child. R.C. 2151.414(D)(1)(a) through (e) set forth the relevant factors that the court must consider in determining what is in the best interest of the child, and all of these factors are of equal importance under the statute. *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

No. 20AP-358

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 215.414(D)(1)(a) through (e).

## III. Assignments of error and review

{¶ 20} J.M. now asserts four assignments of error with the trial court's judgment:

> [I.] The trial court was without jurisdiction to dispose of the agency's February 12, 2018 PCC motion and award permanent court custody of J.C. to FCCS inasmuch as the agency withdrew that motion on April 1, 2019. The trial court's decision and entry awarding PCC to the agency was therefore void ab initio.
>
> [II.] The court's award of permanent custody to the agency was not supported by clear and convincing evidence and was against the manifest weight of the evidence.
>
> [III.] At the September 11, 2017 hearing the juvenile court plainly erred when it modified and/or terminated the then-existing dispositional orders without considering whether returning J.C. to [J.M.] was within [the] child's best interest pursuant to R.C. 2151.42(A).
>
> [IV.] The lower court erred when at the 11/5/2019 hearing it failed to dismiss the PCC motions of the agency (assuming, without conceding, it was still pending) and GAL, who both represented to the court that PCC was not in J.C.'s best interest.

{¶ 21} In her first assignment of error, J.M. contends the trial court lacked subject-matter jurisdiction to decide the issue of permanent custody because FCCS withdrew its motion for permanent custody on April 1 and again on November 5, 2019.

{¶ 22} But, the record as to withdrawal of the motion is far more equivocal than J.M. suggests. In general, it appears that FCCS' counsel was simply operating on the information she had at the time of the hearings, and fully acquiesced in continuing the case each time so that more information could be obtained. At no point did any of the counsel below suggest that or act as if the court had no authority to proceed. A detailed review of the record indicates that all parties and the trial court itself believed that the issue of J.C.'s custody remained unresolved and that a permanent custody order was still a possible outcome. In fact, after J.M. absconded to Pittsburgh and failed to appear for the December 11, 2019 hearing, all present parties, including FCCS' counsel and J.M.'s counsel, signed a continuance "to set pending motions for trial - PCC x2 and motion for  LC [legal custody] to former fo[ster] Mo[ther]."  (Dec. 11, 2019 Mot. and Entry for Continuance.)

{¶ 23} Moreover, although it is true that the proponent of a motion is generally not required to seek leave prior to withdrawing the motion, *see, e.g., Byers v. Robinson*, 10th Dist. No. 08AP-204, 2008-Ohio-4833, ¶ 22, once a permanent custody motion is filed under R.C. 2151.413, the juvenile court is statutorily required under R.C. 2151414(A)(2) to issue an order regarding the motion. The statute states the "court *shall issue* an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than two hundred days after the agency files the motion." (Emphasis added.)  No such order was ever issued in this case—at least not until the court granted the motion for permanent custody.

{¶ 24} Given the length of time the agency's motion had been pending and the duration of the agency's temporary custody of J.C., if the option of permanent custody was completely taken off the table at either the April or November 2019 hearings, the court would have had a duty to issue a different order regarding J.C.'s custody pursuant to R.C. Chapter 2151. But the issue of what that disposition would be remained under dispute at all times relevant to J.M.'s claim—FCCS requested temporary custody to J.M. under COPS, the GAL objected to return to J.M. and suggested either permanent custody to FCCS or legal custody to J.C.'s foster mother, and J.C. herself was equivocal and undecided.

{¶ 25} Aside from these practical concerns, J.M.'s essential claim—that the trial court lacked subject-matter jurisdiction to terminate her parental rights and grant permanent custody of J.C. to FCCS—is both legally and logically false.

{¶ 26} First, subject-matter jurisdiction is a matter of the authority of courts to act over a class of cases, not over a particular individual case. FCCS has correctly directed this court to R.C. 2151.23(A)(1), which provides that the juvenile court "*has exclusive original jurisdiction* under the Revised Code * * *. Concerning any child who on or about the date specified in the complaint, indictment, or information is alleged * * * to be a juvenile traffic offender or a delinquent, unruly, abused, neglected, or dependent child." (Emphasis added.) As the Supreme Court of Ohio has held when addressing a similar question regarding the subject-matter jurisdiction of juvenile courts:

> Subject-matter jurisdiction connotes the power to hear and decide a case upon its merits. The General Assembly established the jurisdiction of juvenile courts and, in R.C. 2151.23(A)(1), granted them exclusive, original jurisdiction concerning matters involving a neglected or dependent child. *This action, therefore, involving the permanent custody of [a child] following a complaint alleging neglect, is within the subject-matter jurisdiction of the juvenile court as specified in R.C. 2151.23(A)(1).*

(Emphasis added.) (Citations and quotations omitted.) *In re J.J.*, 111 Ohio St.3d 205, 2006-Ohio-5484, ¶ 11. The court went on to distinguish subject-matter jurisdiction over a class of cases from "jurisdiction over the case," which "involves the trial court's authority to determine a specific case within that class of cases that is within its subject matter jurisdiction." (Citations and quotations omitted.) *Id.* at ¶ 12. The court concluded that where a court possesses subject-matter jurisdiction, to challenge a court's "jurisdiction over the case" must "object in the trial court and timely preserve the error for appeal and the distinction between subject-matter jurisdiction and jurisdiction over the particular case." *Id.* at ¶ 15. It almost goes without saying that no such objection was lodged in this case; as noted above, all parties proceeded at all times with the understanding that the trial court had the authority to terminate J.M.'s parental rights and grant permanent custody of J.C. to FCCS.

{¶ 27} Additionally, J.M.'s contention rests on the mistaken premise that the court's authority over J.C.'s custody matters must be determined by whether a permanent custody motion was filed. But as this court has already held, the authority of a juvenile court to grant permanent custody in a case is not measured by the filing of a motion, but by the filing of a complaint. *See, e.g.*, *In re L.H.*, 10th Dist. No. 06AP-23, 2006-Ohio-4116, ¶ 8 (holding that

in an appeal of a permanent-custody order, "[t]he trial court acquired subject-matter jurisdiction over this matter with the filing of a dependency complaint"). Permanent custody is not a cause of action; rather, it is a *disposition*, albeit one with specific conditions and procedural protections for the party whose parental rights are subject to termination. As stated by R.C. 2151.353(A)(4):

> If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition * * * [c]ommit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child. If the court grants permanent custody under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding.

{¶ 28} R.C. 2151.353 is clear that the juvenile court has the authority to grant permanent custody of a child to a public children services agency so long as the requirements of R.C. 2151.414 are satisfied. In fact, the plain terms of R.C. 2151.353(C) specifically permit a trial court to grant permanent custody to an agency without the filing of a motion if "the complaint alleging the abuse, neglect, or dependency contains a prayer requesting permanent custody * * * the summons served on the parents of the child contains as is appropriate a full explanation that the granting of an order for permanent custody permanently divests them of their parental rights * * * and the summons served on the parents contains a full explanation of their right to be represented by counsel and to have counsel appointed pursuant to Chapter 120 of the Revised Code if they are indigent." *See, e.g., In re Burkhart*, 12th Dist. No. CA90-07-146 (Aug. 19, 1991) (holding that temporary custody to a public children services agency is not a prerequisite to permanent custody to the agency), and *In re Z.D.*, 5th Dist. No. 12 CA 30, 2012-Ohio-3659, ¶ 4-5, ¶ 43 (affirming award of permanent custody to agency).

{¶ 29} While the filing of a motion by a public children services agency under R.C. 2151.413 is generally a predicate to a trial court's award of permanent custody under R.C. 2151.414, the issue is not one of the court's subject-matter jurisdiction, or even of the court's

jurisdiction over the case. *See, e.g., L.H.* at ¶ 8 (holding that in an appeal of a permanent-custody order, "[t]he trial court acquired subject-matter jurisdiction over this matter with the filing of a dependency complaint"). Instead, the motion is simply a procedural due process requirement that can be forfeited or waived under the proper circumstances. *See, e.g., Z.D.* at ¶ 4-5, 43 (affirming permanent custody to agency without agency filing of permanent custody motion and where agency opposed permanent custody).  And here, even if the actions of J.M. and her counsel in acquiescing to continuing the case, scheduling a hearing on FCCS' motion, and failing to object to the trial court deciding that motion are somehow deemed to not forfeit or waive the objection she now raises on appeal, it is beyond dispute in the record that an independent motion for an award of permanent custody to FCCS was filed prior to the April 1, 2018 hearing at which FCCS first indicated that it did not intend to proceed on its own motion.

{¶ 30}  In *Stoll v. Crawford County Dept. of Job & Family Servs.*, 119 Ohio St.3d 494, 2008-Ohio-4570, the Supreme Court held that Chapter 2151 contains independent authority permitting a GAL to file such a motion:

> The role of the guardian ad litem * * * is to protect the interests of the child. R.C. 2151.281(B)(1). The guardian ad litem must "faithfully" discharge that duty. R.C. 2151.281(A) and (D). A guardian ad litem is given wide latitude to carry out his or her responsibilities on behalf of the child and may file any motion necessary to protect the best interests of the child. R.C. 2151.281(I).  In addition, R.C. 2151.415(F) specifically authorizes the guardian ad litem to file a motion for any dispositional order set forth in R.C. 2151.415(A), including (A)(4), an order to terminate parental rights. Such an order is equivalent to an order for permanent custody because once the court orders parental rights terminated, permanent custody of the child vests in the public children services agency.

*Id.* at ¶ 14. As noted above, the GAL's motion was withdrawn on the date of trial, and only then because it was seen as "duplicative." (Feb. 20, 2020 Tr. at 5.)  Therefore, even if FCCS' motion were somehow considered withdrawn on April 1 or November 5, 2019, on the date the case proceeded to trial the court still had before it a valid motion for permanent custody upon which it was authorized to proceed. And it must be reiterated that no objections were lodged at any point to the trial court's proceeding to judgment.

{¶ 31} In sum, the alleged error of which appellant complains was not preserved for review by an objection, and even if the court's decision to proceed on FCCS' motion was somehow erroneous (which is not clear from the record), it is not an error of which J.M. herself can obtain relief as she failed to appear for trial. And given the unusual factual circumstances of this case—the length of FCCS' custody, the prior denial of a permanent custody motion, the subsequent filing of multiple permanent custody motions, and the actions of both the parties and the trial court relating to the progress and decision on those motions, that failure to appear and object to the court's determination of the motion is significant. The trial court had both subject-matter jurisdiction pursuant to R.C. 2151.23(A)(1) and jurisdiction over the case pursuant to R.C. 2151.353(A)(4), and therefore had the authority under Chapter 2151 to grant permanent custody of J.C. to FCCS. J.M.'s first assignment of error is overruled.

{¶ 32} In her second assignment of error, J.M. argues the decision granting permanent custody to FCCS was not supported by clear and convincing evidence. As observed above, a court may grant permanent custody of a child to a public agency if, after a hearing, it determines by clear and convincing evidence, that "(1) any of the circumstances in R.C. 2151.414(B)(1)(a) through (d) exist, and (2) such relief is in the best interest of the child." *K.M.* at ¶ 14.

{¶ 33} Here, review of the record reveals that the evidence was more than sufficient to justify granting permanent custody to FCCS. J.C. was in agency custody for over 5 years and out of [J.M.'s] custody for over 7 years, clearly satisfying R.C. 2151.414(B)(1)(d). She was over 15 at the time of trial and did not want to return to [J.M.'s] custody. J.M. did not complete her counseling, failed to complete her reunification plan, absconded with J.C. in defiance of court orders, caused J.C. to miss school and required medical appointments for serious medical conditions, missed numerous drug screens, was non-compliant with a court order by having removed her SCRAM device some 3 months prior to trial, and failed to appear at trial. For all these reasons, J.M. failed to demonstrate that she had fully resolved her persistent substance abuse problems, which were the main conditions requiring removal of J.C. from her care. J.C.'s need for a stable, permanent placement and J.M.'s consistent inability to provide that placement are essentially beyond dispute in the

No. 20AP-358

record. The trial court's permanent custody judgment is supported by clear and convincing evidence. J.M.'s second assignment of error therefore lacks merit and is overruled.

{¶ 34} J.M.'s third assignment of error contends the trial court erred at a hearing on September 11, 2017, by granting FCCS' motion for an alternative disposition of temporary custody.

{¶ 35} This alleged error relates to the court's action in permitting J.C.'s former foster parents to relinquish legal custody of her and granting temporary custody back to the agency without first determining that she could not be returned to the custody of J.M. On March 20, 2017, FCCS was granted a temporary care order for J.C., and on June 2, 2017, FCCS filed a motion for an alternative disposition of temporary custody over J.C., which was granted by a magistrate and journalized on September 13, 2017. No objections were filed to the magistrate's decision, and it was approved and adopted by the juvenile court.

{¶ 36} Whatever error J.M. alleges may have occurred when the trial court granted this motion, she cannot raise it in this appeal. The September 13, 2017 order granting temporary custody to the agency was final and appealable under R.C. 2505.02. *See, e.g., In re Murray*, 52 Ohio St.3d 155 (1990), syllabus. Accordingly, pursuant to App.R. 4, any appeal of this issue is untimely by some three and-one-half years. J.M.'s third assignment of error is overruled.

{¶ 37} Finally, in her fourth assignment of error, J.M. contends the trial court erred at the November 5, 2019 hearing by failing to dismiss both pending permanent custody motions. J.M. contends that because both FCCS and the GAL made representations on the record that they did not favor permanent custody at that time, the trial court should sua sponte have dismissed their permanent custody motions. But this assignment of error must be overruled for reasons that the trial court plainly articulated on the record:

> Well, *without any real evidence before the Court, I'm just getting reports*, *we have very conflicting reports* but the -- the Agency's -- the caseworker is hearing -- not hearing the same thing as the -- as the CASA Volunteer and [J.M.'s] position is basically pretty much the same as what the Agency is saying, that -- there's nothing that serious in regard to her health care. *I'm a little uncomfortable in making this decision without actually hearing any evidence.*

(Emphasis added.) (Nov. 5, 2019 Tr. at 45-46.) J.M. cites no caselaw to suggest that a trial court should be reversed for cautious decision making. In fact, it strains credulity to think

that a case supporting such an argument actually exists. In any event, the court's decision to defer considering dismissal under these circumstances was undoubtedly within the wide discretion that courts enjoy over their own proceedings. J.M.'s fourth assignment of error wholly lacks merit.

## IV. Conclusion

{¶ 38}   We overrule all four of J.M.'s assignments of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

DORRIAN, P.J, concuring in judgment only.
JAMISON J., concurring in part and dissenting in part.

_____

DORRIAN, P.J., concurring in judgment only.

{¶ 39} I respectfully concur in judgment only with the lead opinion and would overrule the first, second, third, and fourth assignments of error.

{¶ 40} I address in particular the limited reasons I would overrule the first assignment of error.

{¶ 41} In *In re Poling,* 64 Ohio St.3d 211 (1992), the Supreme Court of Ohio distinguished R.C. 2151.23(A) and 2151.353(A).   The court held that R.C. 2151.23(A) governs the jurisdiction of the juvenile court; whereas, R.C. 2151.353(A) involves the disposition of abused, neglected, or dependent children and "list[s] [the] [six] ways in which a juvenile court may determine the custody, care and supervision of the children." *Id.* at 214.   Pursuant to R.C. 2151.23(A)(1), "[t]he juvenile court has exclusive jurisdiction * * * [c]oncerning any child who * * * specified in the complaint * * * is alleged * * * to be a * * * abused, neglected or dependent child."  Pursuant to R.C. 2151.353(A)(4), "[i]f a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following [six] orders of disposition: * * * [c]ommit the child to the permanent custody of a public children services agency."

{¶ 42} The issue before us in the first assignment of error is whether the juvenile court had subject-matter jurisdiction.  In *In re: J.J.*, 111 Ohio St.3d 205, 2006-Ohio-5484, ¶ 11, the Supreme Court held: "Subject-matter jurisdiction 'connotes the power to hear and

decide a case upon its merits.'  *Morrison v. Steiner* (1972), 32 Ohio St.2d 86, 87.  The General Assembly established the jurisdiction of juvenile courts and, in R.C. 2151.23(A)(1), granted them exclusive, original jurisdiction concerning matters involving a neglected or dependent child."  The court further held, that the action before it, involving the permanent custody of J.J. following a complaint alleging neglect, was within the subject-matter jurisdiction of the juvenile court as specified in R.C. 2151.23(A)(1) and, therefore, the juvenile court's decision and entry awarding PCC to the agency was not void.

{¶ 43}  Consistent with the Supreme Court's holdings in *Poling* and *J.J.*, I concur in judgment only with the lead opinion and would hold that the juvenile court had subject-matter jurisdiction, pursuant to R.C. 2151.23(A)(1),  to preside over the neglect and dependency complaint involving J.C. and, once J.C. was adjudicated dependent, to consider which order of the six orders of disposition listed in R.C. 2151.353(A) to impose. Accordingly, I would overrule the first assignment of error.

{¶ 44}  I also address why I reject appellant's argument in support of her second assignment of error—that there was no lawfully pending PCC motion when the trial court awarded PCC of J.C. to FCCS.  The issue here is whether the juvenile court properly ordered disposition of the case once J.C. was adjudicated a neglected and dependent child.

{¶ 45}  The General Assembly has limited a juvenile court's exercise of the disposition outlined in R.C. 2151.353(A)(4), committing a child to the permanent custody of a public children services agency.  R.C. 2151.353(C), in relevant part, states:

> No order for permanent custody * * * of a child * * * shall be made pursuant to this section *unless* the complaint alleging the abuse, neglect, or dependency contains a prayer requesting permanent custody * * *.
>
> If after making disposition as authorized by division (A)(2) of this section [temporary custody], a motion is filed that requests permanent custody of the child, the court may grant permanent custody of the child to the movant in accordance with section 2151.414 of the Revised Code.

(Emphasis added.)

{¶ 46}  Therefore, in order for a juvenile court to order the disposition of permanent custody, it must have pending before it either: (1) a prayer requesting permanent custody included in the abuse, neglect, or dependency complaint, or (2) a motion requesting

permanent custody filed after the court has ordered a disposition of temporary custody. The juvenile court cannot sua sponte order a disposition of permanent custody. Here, while the complaint alleging neglect and dependency did not contain a prayer requesting permanent custody, after the trial court made a disposition pursuant to R.C. 2151.353(A)(2) committing the child to the temporary custody of FCCS, FCCS filed a motion requesting permanent custody of the child.

{¶ 47} On the facts of this case, as outlined in the lead opinion's discussion of factual and procedural background and paragraph 22, I cannot agree with appellant that no lawfully pending PCC motion was pending when the juvenile court ordered the disposition of permanent custody to FCCS. I further consider that pursuant to R.C. 2151.414(A)(2), the juvenile court was required to "issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order," and the only order the juvenile court issued was the order to grant FCCS' PCC motion. Finally, I note that the GAL's PCC motion was still pending.

{¶ 48} Therefore, I concur in judgment only and would affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

JAMISON, J. concurring in part and dissenting in part.

{¶ 49} I concur in lead opinion as to the third assignment of error. I disagree, however, with the  disposition of appellant's second and fourth assignments of error as I believe the juvenile court lacked jurisdiction to grant PCC. Accordingly, I would sustain appellant's first and fourth assignments of error and moot appellant's second assignment of error. Because the lead opinion does not, I respectfully concur in part and dissent in part.

{¶ 50} First and foremost, I disagree with the conclusion that a pending motion for PCC is a matter of personal jurisdiction that may be waived by the parties rather than a requirement of subject-matter jurisdiction. I also disagree with the concurring opinion that a motion for PCC was pending before the juvenile court at the time the juvenile court ordered PCC. I am also concerned that the rule of law adopted by both the lead opinion and the concurring opinion permits the juvenile court to grant PCC to a public services agency even though the agency has informed the juvenile court that the stated grounds for PCC no longer exist and that PCC is not in the best interest of the child.

No. 20AP-358

{¶ 51} As a general rule, "in order to render a valid personal judgment, a court must have personal jurisdiction over the defendant. This may be acquired either by service of process upon the defendant, the voluntary appearance and submission of the defendant or his legal representative, or by certain acts of the defendant or his legal representative which constitute an involuntary submission to the jurisdiction of the court. The latter may more accurately be referred to as a waiver of certain affirmative defenses, including jurisdiction over the person under the Rules of Civil Procedure." *Maryhew v. Yova*, 11 Ohio St.3d 154, 156 (1984).

{¶ 52} Conversely, " '[s]ubject-matter jurisdiction of a court connotes the power to hear and decide a case upon its merits' " and " 'defines the competency of a court to render a valid judgment in a particular action.' " *Cheap Escape Co., Inc. v. Haddox, L.L.C.,* 120 Ohio St.3d 493, 2008-Ohio-6323, ¶ 6, quoting *Morrison v. Steiner*, 32 Ohio St.2d 86 (1972). "[G]eneral subject-matter jurisdiction of Ohio courts of common pleas is defined entirely by statute pursuant to Section 4(B), Article IV of the Ohio Constitution, which states that 'the courts of common pleas and divisions thereof shall have such original jurisdiction over all justiciable matters * * * as may be provided by law.' " *State v. Wilson*, 73 Ohio St.3d 40, 42 (1995). The General Assembly created Ohio's juvenile courts as a division of the courts of common pleas by the enactment of R.C. 2151.07. R.C. 2151.23 sets forth the general jurisdiction of juvenile courts in relevant part as follows:

> (A) The juvenile court has exclusive original jurisdiction under the Revised Code:
>
> (1) Concerning any child who on or about the date specified in the complaint * * * is alleged to be * * * a delinquent * * * child.

{¶ 53} It is axiomatic that "[t]he exclusive subject-matter jurisdiction of the juvenile court cannot be waived." *Wilson* at paragraph two of the syllabus, citing *State v. Hicks*, 10th Dist. No. 13AP-429, 2014-Ohio-1444, ¶ 9. Involuntary submission to the jurisdiction of the juvenile court by any party or the lack of prejudice to the juvenile does not waive the exclusive, subject-matter jurisdiction of a juvenile court. *See State v. Baker*, 7th Dist. No. 16 CO 0024, 2017-Ohio-7795, ¶ 21, citing *Wilson.* By the same token, "[a] party's failure to challenge a [juvenile] court's subject-matter jurisdiction cannot be used, in effect, to bestow jurisdiction on a court where there is none." *Wilson* at ¶ 46, citing *Rogers v. Ohio*, 87 Ohio St. 308 (1913), at paragraph one of the syllabus. *See also Hicks* at ¶ 9.

{¶ 54} The lead opinion concludes that no objection was made in mother's absence by mother's counsel therefore the juvenile court had subject-matter jurisdiction to proceed. I disagree. As a matter of law, subject-matter jurisdiction cannot be conferred by consent or agreement. In matters involving child custody, "[p]arties cannot confer by consent or agreement subject-matter jurisdiction on a court where subject-matter jurisdiction is otherwise lacking." *In re Weller*, 10th Dist. No. 05AP-678, 2006-Ohio-3015, ¶ 14, citing *Fox v. Eaton Corp.* 48 Ohio St.2d 236, 238 (1976), overruled on other grounds, *Manning v. Ohio State Library Bd.*, 62 Ohio St.3d 24 (1991).

{¶ 55} Juvenile court jurisdiction of PCC determinations arises under R.C. 2151.353(A), which authorizes the juvenile court to "[c]ommit [a] child to the temporary custody of * * * [a] public children services agency" when the child is "adjudicated an abused, neglected, or dependent child." R.C. 2151.353(A)(2). R.C. 2151.353(C) further provides, in relevant part:

> No order for permanent custody or temporary custody of a child or the placement of a child in a planned permanent living arrangement shall be made pursuant to this section unless the complaint alleging the abuse, neglect, or dependency contains a prayer requesting permanent custody
>
> * * *
>
> *If* after making disposition as authorized by division (A)(2) of this section*, a motion is filed that requests permanent custody of the child, the court may grant permanent custody of the child to the movant in accordance with section 2151.414 of the Revised Code.*

(Emphasis added.)

{¶ 56} "As a statutory court, the juvenile court has limited jurisdiction, and it can exercise only the authority conferred upon it by the General Assembly." *In re Z.R.*, 144 Ohio St.3d 380, 2015-Ohio-3306,¶ 14, citing *State ex rel. Ramey v. Davis*, 119 Ohio St. 596 (1929), paragraph four of the syllabus. Under the statutory scheme, the juvenile court has jurisdiction to grant a motion filed by a public children services agency for permanent custody of an abused, neglected, or dependent child, but only "if * * * a motion is filed that requests permanent custody of the child." (Emphasis added.) R.C. 2151.353(C). In my view, the statutory jurisdictional requirements are clear. In order for the juvenile court to

No. 20AP-358

have jurisdiction to hear and determine whether permanent custody of a child should be granted to an agency, a pending motion for PCC filed pursuant to R.C. 2151.414(A) is required. In the absence of such a motion, a juvenile court lacks jurisdiction to order PCC.

{¶ 57} In reaching this conclusion, I find it significant that the General Assembly, in enacting R.C. 2151.414(A)(2), expressly provided that "failure of the court to comply with the time periods set forth in division (A)(2) * * * does not affect the authority of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order." By implication, the intent of the General Assembly in enacting R.C. 2151.414(A)(2) is that other substantive provisions in the statute are to be treated as jurisdictional in nature, including the filing and pendency of a motion for PCC. This means that an order of permanent custody would be subject to collateral attack on jurisdictional grounds if it were made in the absence of a pending motion for PCC. I do not perceive any other reasonable construction of the statutory language.

{¶ 58} Here the agency invoked the jurisdiction of the juvenile court to grant PCC when it filed the required motion on February 12, 2018. Though the lead opinion concludes that "the record as to withdrawal of the motion is far more equivocal than J.M. suggests," my reading of the April 1, 2019 transcript reveals no such equivocation on the part of FCCS. (Lead opinion at ¶ 22.) The transcript of the April 1, 2019 hearing reads in relevant part as follows:

> [THE COURT]: We're on the record; 13JU-6011, the matter of [J.C.] case was assigned for hearing on the Agency's motion for permanent custody filed February 12, 2018. Recently, on March 28, 2019 the CASA Guardian ad Litem filed a motion for permanent custody. An in-camera was scheduled for 9 o'clock.
>
> * * *
>
> [FCCS COUNSEL]: Thank you, Your Honor. At this point in time my client, Franklin County Children Services, wants to withdrawal the motion for permanent custody that the Agency filed on February 12, 2018 based on mother's case plan compliance and what my Agency believes to be in the best interest of the child. The Agency has seen a -- a real turnaround as far as mother's stability in housing and employment, as well as her compliance with random urine screens. Although her results certainly aren't perfect, she's

No. 20AP-358

> still not doing 100 percent of her urine screens, every one she's done since we were last here for a pre-trial in January has been clean. And she's completed something like 60 percent of all the screens since we were here January 10th. *So, at this point in time, the Agency would ask the Court to withdrawal the motion for permanent custody, terminate temporary custody to the Agency with a COPS order.*

(Emphasis added.) (Apr. 1, 2019 Tr. at 3.)

{¶ 59} When the subject of FCCS's desire to prosecute the motion for PCC came up later in the proceedings, counsel for FCCS told the court that she had previously informed the GAL that FCCS intended to withdraw the motion, but that "I didn't give him a definitive answer until probably last week." (Apr. 1, 2019 Tr. at 14.) Counsel then told the juvenile court, once again, FCCS wished to withdraw the PCC motion and its reason for doing so:

> [FCCS COUNSEL]: - I gave him [GAL] a definitive answer. But I would just like to point out, Your Honor, the last time mother actually tested positive for alcohol was July of 2018. After that she did have a screen that was deemed positive in September of 2018 because the creatinine was out of range. But since then she hasn't had anything but negative or missed screens. And this is a really unusual position for me to be in, Your Honor, and the Agency advocating on behalf of a parent against the Guardian ad Litem, but because of the child's wishes, because of the kinda (sic) turnaround in mom's case plan compliance, it's still not perfect, I wish it was better. *The Agency is asking to withdrawal the motion.*

(Emphasis added.) (Apr. 1, 2019 Tr. at 14.)

{¶ 60} Counsel for FCCS clearly and unequivocally informed the juvenile court on April 1, 2019, FCCS had elected to withdraw the February 12, 2018, motion for PCC because of mother's recent "turnaround" and "compliance" with the case plan. (Apr. 1, 2019 Tr. at 14.) The record of the April 1, 2019 hearing therefore establishes that FCCS no longer believed the stated grounds for PCC existed and PCC was not in the best interest of J.C. The fact that the GAL filed a motion for PCC on March 28, 2019 further evidences the agency's intentions regarding PCC. FCCS subsequently informed the juvenile court of its continued

No. 20AP-358

desire to withdraw the motion for PCC at hearings held on September 12, 2019 and November 5, 2019.[1]

{¶ 61} As the lead opinion correctly observes, "the proponent of a motion is generally not required to seek leave prior to withdrawing the motion." *Byers v. Robinson*, 10th Dist. No. 08AP-204, 2008-Ohio-4833, ¶ 22. Appellee has not cited any provision in R.C. Chapter 2151 that expressly requires the agency to obtain court approval before withdrawing a motion for PCC, and no such provision has been cited by the lead opinion. Thus, the record establishes that the February 12, 2018, motion for PCC was no longer pending.

{¶ 62} The lead opinion relies on *In re Z.D.*, for the proposition that the filing of a PCC motion by the agency, pursuant to R.C. 2151.413, may be waived or forfeited. However, the facts of *In re Z.D.* are materially different from this case and a different result is required. In that case, the agency did not file a PCC motion, but the GAL did, and that motion was pending in the juvenile court when the juvenile court granted permanent custody to the agency. *Id.* Here, FCCS withdrew the February 12, 2018 motion for PCC on April 1, 2019, and the GAL withdrew his March 28, 2019, motion for PCC during his opening statement at the permanent custody hearing. Thus, there was no motion for PCC pending in the juvenile court when the juvenile court committed J.C. to the permanent custody of FCCS. Because there was no motion for PCC pending in the juvenile court when the juvenile court committed J.C. to the custody of FCCS, the juvenile court acted without jurisdiction.

{¶ 63} Based on the foregoing, I would find that the juvenile court acted without subject-matter jurisdiction on March 13, 2020, when it granted a motion for PCC that had been withdrawn, and I would sustain appellant's first assignment of error.

{¶ 64} Both the lead opinion and the concurring opinion nevertheless conclude that the motion for PCC was not withdrawn on April 1, 2019 because the juvenile court did not issue an order disposing of the motion. I disagree.

{¶ 65} In my opinion, R.C. 2151.414(A)(2) imposes a duty on the juvenile court to acknowledge withdrawal of the February 12, 2018 motion and issue a timely order

---

[1] On September 12, 2019, counsel for FCCS informed the court " * * * I feel confident as everyone does here that PCC is not what's in [J.C.'s] best interest." (Sept. 12, 2019 Tr. at 79.)

No. 20AP-358

disposing of the motion. In fact, the record shows that this is exactly what the juvenile court did when the GAL withdrew his motion for PCC. During the GAL's opening statement, the GAL withdrew his motion for PCC:

> [GAL]: I am -- I am withdrawing the motion for legal custody, Your Honor, and with Children Services going forward on their motion for permanent custody[.] I would also withdrawal the Guardian's motion for permanent custody as it's duplicative.

(Feb. 26, 2020 at Tr. at 26.)

**{¶ 66}** In the March 13, 2020 judgment entry, the juvenile court disposed of the GAL's motion for permanent custody as follows: "*The March 28, 2019, motion for permanent custody* and the December 4, 2019, motion to grant legal custody of [J.C.] to the child's foster mother filed by CASA of Franklin County are *dismissed*." (Emphasis added.)

**{¶ 67}** The juvenile court recognized its statutory duty to dispose of the GAL's PCC motion, upon withdrawal, and disposed of the motion by dismissal. Had the juvenile court acknowledged that counsel for FCCS withdrew FCCS's motion for PCC on April 1, 2019 and timely issued an order disposing of the motion, as it was required to do, the confusion that resulted in the subsequent withdrawal of the GAL's motion for PCC could have been avoided. Accordingly, I find that the juvenile court committed reversible error when it failed to timely dispose of the motion for PCC filed by FCCS, and I would sustain appellant's fourth assignment of error.

**{¶ 68}** "As the right to raise and nurture one's children is fundamental, statutory conditions which serve to overcome that right must be strictly construed." *In re Janson*, 11th Dist. No. 2005-G-2656, 2005-Ohio-6712, ¶ 34, citing *In re Cunningham* 59 Ohio St.2d 100 (1979). The general assembly, in enacting Chapter 2151 of the Ohio Revised Code, has recognized the need to preserve and safeguard parental rights. R.C. 2151.01 specifically requires Chapter 2151 be "interpreted and construed so as to effectuate * * * purposes of provid[ing] for the care, protection, and mental and physical development of children * * * in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety."

**{¶ 69}** In my view, the rule of law adopted by the lead opinion is inconsistent with the dictates of R.C. 2151.01 because it permits the juvenile court to grant PCC to a public

services agency even though the agency has informed the juvenile court that it no longer believes the stated grounds for PCC exist and PCC is not in the best interest of the child. It does not require a great deal of imagination to foresee that a juvenile court, a GAL, or a public or private children services agency might take advantage of such a legal rule to unfairly delay reunification even though the party that moved for PCC no longer believes that the stated grounds for PCC exist and that PCC is not in the child's best interest. In a case where reunification is in the best interest of a child, a matter of months is an eternity.

{¶ 70} For the foregoing reasons, I would sustain appellant's first and fourth assignments of error, moot appellant's second assignment of error, and overrule appellant's third assignment. I would reverse the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, and vacate the judgment granting PCC to FCCS. Because the lead opinion does not, I concur in the lead opinion in part and dissent in part.

_____